## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| **DEI VITAE ENTERPRISES, LLC** | ) | **Case No. 23-30148** |
| | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

## MOTION FOR AUTHORITY TO SELL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, OR ENCUMBRANCES PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE

**NOW COMES** DEI VITAE ENTERPRISES, LLC, the debtor and debtor in possession in the above captioned chapter 11 case (the "Debtor"), and hereby moves the Court, for the entry of an order: (i) authorizing the Debtor to sell substantially all of its assets (the "Assets" defined below) to BHEA Holdings, LLC, or its assignee (the "Proposed Purchaser"), free and clear of all liens, claims, interests, and encumbrances. In support of this motion, the Debtor respectfully represents as follows:

### JURISDICTION

1.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this case and this motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3 .     The statutory predicates for the relief requested herein are sections 105(a), 363(b), 363(f), 363(m), and 363(n) of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1(e)(1).

## BACKGROUND

4.      The Debtor filed a chapter 11 petition on February 28, 2023.

5.      On June 28, 2023, the Debtor timely filed its Chapter 11 Plan of Liquidation and Disclosure Statement [Doc. Nos. 99 and 100].

6.       The Debtor has been embroiled in many disputes since 2021 which include shareholder disputes with a related entity, foreclosure of its Real Property and various other litigation.  The primary purpose of the bankruptcy was to unwind the Debtor and resolve competing interests amongst various parties who assert claims against the Debtor as well as its property.

7.      Due to capital restraints, the Debtor does not operate oil and gas wells located on the Real Property (defined below) or the Working Interests (defined below).  Rather, the Debtor would lease the operations to entities related to the Debtor or third parties.   Disputes arose amongst those parties.  Consequently, in order to maximize a return for its creditors and facilitate an efficient resolution, the Debtor elected to liquidate its assets and interests.

8.      As such, on March 21, 2023, the Debtor filed that certain *Motion for Authority to Sell Property Free and Clear of All Liens, Claims, Interest, or Encumbrances Pursuant to Sections 105 and 363 of the Bankruptcy Code* (the "Sale Motion") [Doc. No. 27].  The Sale Motion contemplated affirming a pre-petition contract with Marigny Oil & Gas, LLC, a Wyoming limited liability company ("MOG") in which the Debtor was proposing to sell substantially all of its assets to MOG.

9.      However, due to the clear inability and/or unwillingness of MOG to complete and consummate the transaction, the Debtor, along with other pertinent parties, entered into that

certain *Consent Order Referencing the Bankruptcy Administrator's Motion to Dismiss Case or, In The Alternative, Convert Case to Chapter 7* (the "Consent Order"). [1][Doc. No. 101].

10.     The Consent Order provided that the case would either be dismissed or converted at hearing to be held on August 9, 2023, in the event that the Debtor failed to file a new sale motion on or before July 31, 2023.  Under the terms of the Consent Order, the Debtor was also to furnish a (i) letter of intent, (ii) sufficient deposit and/or letter of credit, and (iii) indication that the new purchaser had retained local counsel.

11.     Since the entry of the Consent Order, the Debtor has identified two potential purchasers.  The first being BHEA Holdings, LLC, or its assignee, as the Proposed Purchaser as well as a second potential purchaser unrelated to the Proposed Purchaser or MOG.

12.     On July 24, 2023, the undersigned and the Debtor's insider held a zoom conference with the Proposed Purchaser to discuss the case, the requirements in the Order and the requirements to file this Motion.  Said zoom conference was held for approximately 45 minutes.

13.     On July 31, 2023, the Debtor received a Letter of Intent to purchase the Debtor's assets for the commitment of $3,000,000.00 (the "Offer"). Attached hereto as **Exhibit A** is a true and accurate copy of the Letter of Intent which is incorporated by reference as if fully set forth herein.

### I.      *Proposed Purchaser*

14.     The Proposed Purchaser is a hedge fund located in Houston, Texas.  The principals are Brian D. Carr, and Dr. Matthew Carr.  Attached hereto as **Exhibit B** is a true and accurate copy of the biographical information of the principals of the Proposed Purchasers as well as their team.

---

[1] The Bankruptcy Administrator filed that certain Motion to Dismiss Case, or, in the Alternative, Convert Case to Chapter 7 (the "Motion to Dismiss") [Doc. No. 50].

15.     The Debtor will not have an interest in the Proposed Purchaser's special asset entity.

16.     The Debtor's insiders Reuben Burton and Susan Burton do not have a current employment engagement with the Proposed Purchaser; however, the Debtor's insiders anticipate that there could be some consultation work during the transition to the Proposed Purchaser.

17.     Further, in accordance with the provisions of the Consent Order, the Debtor received a Term Sheet dated June 22, 2023 from the Proposed Purchaser, reflecting that it, or its affiliate, received a commitment of $38,000,000 of capital for its hedge fund to acquire interests in certain real property.  Said commitment letter was provided to the United States Bankruptcy Administrator for the Western District of North Carolina.

## II.     *The Debtor and Assets to be Sold.*

18.     The proposed sale contemplates that the Proposed Purchaser is to purchase the following interests and assets of the Debtor that are specifically included in the Addendum to the Letter of Intent.

19.     The Debtor is the owner of 9874 North HWY KS92, McLouth, KS 66054 (the "Real Property").

20.     Prior to the bankruptcy, the parties transferred the Real Property, however, the Debtor has filed an *Affidavit of Equitable Interest* (the "Affidavit") placing all parties on notice as to the Debtor's interest in the Real property pending approval of this contemplated sale.  Attached hereto as **Exhibit C** is a true and accurate copy of the Affidavit, which is incorporated by reference as if fully set forth herein.

21.     The Proposed Purchaser is aware that due to the pre-petition transfer, the Real Property is subject to claw back under sections 544, 547 and 548 of the Bankruptcy Code as well

as other claims and interests.  The Debtor has made multiple demands on Marigny Oil & Gas ("MOG"), to which MOG has even prepared a Quit Claim Deed to affect a transfer of the Real Property back to the Debtor.  However, to date the Quit Claim Deed remains unexecuted.  Given this lack of cooperation on the part of MOG, the Debtor will proceed with prosecuting vigorously a claim to claw back the Real Property.

22.     In addition to the Real Property, the Debtor holds certain rights to working interests in wells and mines (the "Working Interests").   Attached hereto as **Exhibit D** is a true and accurate copy of a schedule of the Debtor's working interest, which is incorporated by reference as if fully set forth herein.

23.     In addition to the Real Property and Working Interests, the Debtor will sell all personal property located at the Real Property and disclosed on its Schedule A.  This includes:

| | |
|---|---|
| Assorted tools and tool storage boxes ($500) | |
| A diverter (a large HEAVY metal part that Larry and I built together for use in killing high pressure wells and blowouts) ($8,000) | |
| Natural Gas Fan ($100) | |
| Small Jensen Pumpjack ($50) | $8,650.00 |

(the "Personal Property, and together with the Real Property and Working Interests, the Assets").

### III.     Excluding Assets.

24.     The Offer does not include the purchase of any causes of action against third parties, any crypto currency or the real property located in 2210 Midwest Rd., Oakbrook, IL 60013.

25.     The Debtor has had discussions with various parties concerning the liabilities and obligations with the excluded assets that would resolve the various liabilities associated therewith.

#### IV.      *Secured Claims Against Real Property of the Debtor.*

26.      The Real Property is encumbered by a purported lien arising from a domesticated judgment filed on September 29, 2022, in favor of Natan Holdings, LLC ("Natan"). Natan received its alleged judgment via default judgment. Pursuant to the terms agreed upon in the Consent Order, the Debtor amended its classification of Natan's claim as one that is not contingent or unliquidated.

27.      Upon information and belief, prior to the Petition Date, Natan was attempting to confirm a foreclosure against the Real Property in which it was the highest bidder with a credit bid of $500,000.00.

28.      The Real Property has a junior lien holder pursuant to that certain deed of trust in favor of FZA Note Buyers, LLC, in the original principal amount of $150,000.00, No. 2022R3402.

29.      The foregoing contemplated sale does not impair or impact any interest provided in the public record filings in Jefferson County, Kansas in favor of Southern Star Central Gas Pipeline, Inc. ("Southern Star").

30.      Additionally, upon information and belief ARC Energy Development, LLC ("ARC") may also claim an interest in the Debtor's Assets. To the extent that ARC holds an interest in the Real Property, ARC's purported lien, claim, encumbrance and interest shall attach to the proceeds of any purported sale with the same validity, priority and extent that existed as of the Petition Date.

31.      As of the Petition Date, the Debtor is unaware of any additional claims or debt encumbering the Real Property.

32.      Thus, the Offer permits a significant return to the estate above the value of even Natan's valuation of the Real Property evidenced by the credit bid.

## PROPOSED SALE

33.     The Debtor respectfully requests the entry of an order approving the terms of the proposed sale and the Offer with findings and conclusions that provide as follows:

(a) That the Debtor shall transfer the Assets to the Proposed Purchaser pursuant to Sections 363(b) and (f) of the Bankruptcy Code;

(b) That any *Asset Purchase Agreement* and any duly executed ancillary documents such as deeds and bills of sale shall transfer the Assets to the Proposed Purchaser pursuant to Sections 363(b) and (f) of the Bankruptcy Code;

(c) That the Purchaser shall have and acquire at closing good, valid and marketable title to the Assets and the same shall be sold and conveyed to Purchaser free and clear of any and all liens, claims, encumbrances and interests;

(d) That the liens, claims, encumbrances and interests shall attach to the proceeds of the sale with the same validity, priority and extent that existed as to the Assets;

(e) That the sale shall be found to be a "good faith" purchase within the meaning of Section 363(m) of the Bankruptcy Code;

(f) That neither the Debtor nor the Proposed Purchaser engaged in any conduct that would cause or permit the sale of the Real Property to be avoided under 11 U.S.C. § 363(n);

(g) That the consideration provided by the Proposed Purchaser for the Assets (a) is fair and reasonable, (b) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative, and (c) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code as well as the laws of the United States and North Carolina;

(h) That the Court shall waive any stay that would otherwise be applicable to the immediate effectiveness of the order approving the sale pursuant to Bankruptcy Rule 6004(h); and

(h) That should the Debtor be unable to resolve any and all contested liens pursuant to Bankruptcy Rule 9019 and/or any confirmed Plan, the parties shall receive replacement liens and interests in the closing proceeds derived from any sale.

## LAW & ARGUMENT

34.      Pursuant to Section 363(b) of the Bankruptcy Code, a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

35.      A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Continental Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1068-69 (2nd Cir. 1983); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991).

36.      A myriad of factors are used by Courts to determine whether a sound business justification exists, including: (i) whether there is a sound business reason for the proposed transaction, (ii) whether there is fair and reasonable compensation being provided by the proposed transaction, (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate notice has been provided.  *Committee Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2nd Cir. 1983) (setting forth the "sound business purpose" test); *In re Abbots Dairies of Pa., Inc.,* 788 F.2d 143, 146-47 (implicitly adopting the articulated business justification test of In re Lionel Corp. standard and adding the "good faith" requirement);

*In re Charlotte Commercial Group, Inc.*, 2002 WL 31055241, *3 (Bank. M.D.N.C. Aug. 12, 2002) (unreported decision by Judge Aron adopting *Lionel*).

37.     Considering the alternatives available to the estate, sound business justification exists for the proposed sale of the Assets.  The sale results in the most efficient and cost effective of the options available to the bankruptcy estate compared to that of chapter 7, or, alternatively, dismissal.  Further, notwithstanding the bona fide dispute amongst the parties, the proposed sale permits a significant return to the bankruptcy estate that would otherwise not be available.  The sale undoubtedly also falls in line with a core bankruptcy purpose in that it releases the Real Property from any bona fide dispute amongst related parties pursuant to 363(f)(4) of the Bankruptcy Code.

38.     For the reasons stated herein, through an exercise of its business judgment, the Debtor has determined that the proposed sale of substantial all of its Assets is in the best interests of the Debtor, its creditors, and other parties-in-interest involved in this case.

39.     The consideration received by the estate for the sale is fair and reasonable, the transaction has been proposed and negotiated in good faith, and all interested parties have been provided adequate and reasonable notice and consent to the same.

40.     Lastly, the Debtor seeks approval to enter into an Asset Purchase Agreement.  Attached hereto as **Exhibit E** is a proposed Asset Purchase Agreement, which is incorporated by reference as if fully set forth herein.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order granting the relief requested herein and such other and further relief as is just and proper.

Dated:      Charlotte, North Carolina
            July 31, 2023

**ESSEX RICHARDS, P.A.**

_/s/  John C. Woodman_
John C. Woodman (NC Bar No. 42365)
David R. DiMatteo (NC Bar No. 35254)
1701 South Boulevard
Charlotte, North Carolina 28203
Tel: (704) 377-4300
Fax:  (704) 372-1357
E-mail: jwoodman@essexrichards.com

# EXHIBIT A

DocuSign Envelope ID: 079BE796-FE62-4256-8F49-CB40F33A6989



## LETTER OF INTENT

July 31, 2023

<u>Strictly Private and Confidential</u>

Dei Vitae Enterprises LLC
c/o John Woodman, Esq.
Essex Richards, P.A.
1701 South Blvd.
Charlotte, NC 28203

Dear Mr. Woodman:

Based on the initial and preliminary findings by Dr. Mathew Carr of QI Petrophysics, LLC, attached and incorporated hereto as "EXHIBIT A – QI PETROPHYSICS REPORT", the purpose of this Letter of Intent (hereinafter the "LOI") is to express our interest and to set forth the terms and conditions pursuant to which BHEA Holdings, LLC, or one of its subsidiaries (hereinafter "Black Hawk") will enter into an agreement with Dei Vitae Enterprises, LLC (hereinafter "Company") in relation to Black Hawk's participation or investment (TBD) into the KLMKH Kansas O&G Project (hereinafter the "Project"). Black Hawk and the Company may individually be referred to herein as a "Party" or collectively as the "Parties".

While this LOI is not a binding agreement, except as specifically set forth in Section 8 hereinbelow, it outlines the preliminary terms of the Project and the transactions contemplated herein. This LOI is intended to serve as an outline of the proposed principal terms and conditions regarding the Project and is subject to the execution and closing of a definitive agreement ("Definitive Agreement") among Black Hawk and the Company. The Parties recognize that there are other terms and conditions that have yet to be addressed, but the Parties agree to work together in good faith to address these issues and to complete a Definitive Agreement that is acceptable to both Parties as quickly as is practicable.

1. <u>Participation and/or Investment</u>.   Pursuant to the terms and conditions of a Definitive Agreement, Black Hawk or a wholly owned subsidiary of Black Hawk will participate and/or invest in Company's Project in an amount of up to $3,000,000.00 for terms of ownership and/or working interest to be negotiated and included in the contemplated definitive agreement.

2. <u>Closing</u>.   The Parties will use their best efforts to close the transaction contemplated herein as soon as reasonably possible following the execution of this LOI ("Closing") and completion of any Due Diligence performed by Black Hawk as outlined in Section 4 hereinbelow.

3. <u>Due Diligence</u>.

DocuSign Envelope ID: 079BE796-FE62-4256-8F49-CB40F33A6969



3.1. Black Hawk shall conduct a business, financial, and legal due diligence investigation of the Company and the Project to its sole satisfaction.

3.2. To expedite this review, Company agrees to make such information as reasonably requested by Black Hawk ("Due Diligence Information") available to Black Hawk and its agents and representatives and to authorize reasonable visits to the Project, any Project data room, or location of Project records, including meetings with its staff, consultants and experts as reasonably requested by Black Hawk.

3.3. The Due Diligence period shall be for a period of ninety (90) calendar days beginning on the date of acceptance of the LOI by Company (the "Due Diligence Period"). On or before the end of the Due Diligence Period, Black Hawk shall provide Company with its decision to move forward with the Project, subject to the acceptance of both parties to the contemplated Definitive Agreement. In the event Black Hawk does not notify Company of its decision to proceed by the end of the Due Diligence Period, then this LOI shall become null and void, with no obligation assigned for either party.

4. Confidentiality. This LOI is being delivered with the understanding that the Company, together with their respective officers, directors, managers, members, representatives, agents, owners and employees, each agree to use their best efforts to keep the existence of this LOI and its contents confidential. Any information, including but not limited to data, business information (including customer lists and prospects), technical information, computer programs and documentation, programs, files, specifications, drawings, sketches, models, samples, tools or other data, oral, written or otherwise, (hereinafter called "Information"), furnished or disclosed by one party to the other for the purpose of the contemplated transaction herein, will remain the disclosing party's property. All copies of such Information in written, graphic or other tangible form must be returned to the disclosing party immediately upon written request if the transaction contemplated herein is not consummated. Unless such Information was previously known to receiving party free of any obligation to keep it confidential, or has been or is subsequently made public by the disclosing party or a third party, it must be kept confidential by the receiving party, will be used only in performing the Due Diligence for the Project, and may not be used for other purposes except upon such terms as may be agreed upon between Black Hawk and the Company in writing.

5. Expenses. Black Hawk and the Company shall each be responsible for their own fees and expenses incurred as part of the Project and the transactions contemplated under this Agreement, including but not limited to, legal fees, accounting fees, investment banking fees and related expenses.

6. Announcements. No announcement shall be made regarding a pending or completed transaction or agreement between the parties without the prior written consent of both Black Hawk and the Company.

7. Exclusivity. In consideration hereof and of the time and resources that Black Hawk will devote to the Due Diligence of the Project and the Definitive Agreement, and the various investigations and reviews undertaken by Black Hawk, the Company, its subsidiaries and each of their respective affiliates, directors, officers, employees, representatives and agents will not, directly or indirectly, solicit, initiate, enter into or continue any discussions or transactions with, or encourage, or provide any information to any person or entity with respect to any proposal pursuant to which the Company or any of the Subsidiaries would sell all or a substantial part of the Project until Black Hawk accepts the project, declines the project, or the Due Diligence Period expires per Section 3.3, whichever comes first.

**BHE HOLDINGS LLC dba BLACK HAWK EQUITY ADVISORS**

2150 WEST 18TH STREET, SUITE 207 ~ HOUSTON, TEXAS 77008
(409) 276-7076 ~ info@blackhawkea.com

2

DocuSign Envelope ID: 079BE796-FE62-4256-8F49-CB40F33A6969



8.  <u>Non-binding</u>:   Except for Sections 4, 5, 6, and 7 of this LOI (which are legally binding upon execution of this LOI), this LOI is a statement of mutual intention; it is not intended to be legally binding, and does not constitute a binding contractual commitment with respect to the transaction. Without limiting the foregoing, the failure of Black Hawk and the Company to reach agreement on the terms and conditions being included in the Definitive Agreement and other agreements referred to herein shall not be construed as a breach of this LOI by any party hereto provided that the provisions of the four immediately preceding paragraphs are not breached. A legally binding obligation with respect to the transaction contemplated hereby will arise only upon execution and delivery of the Definitive Agreement and other agreements referred to herein by the parties thereto, subject to the conditions expressed therein.

9.  <u>Amendment</u>.  This LOI may not be modified or amended except by a written agreement signed by Parties.

10.  <u>No Waiver</u>.  No party shall be deemed to have waived any provision of this LOI or the exercise of any rights held under this LOI unless such waiver is made expressly and in writing. Waiver by any party of a breach or violation of any provision of this LOI shall not constitute a waiver of any other subsequent breach or violation.

11.  <u>Assignment</u>.  The parties agree that their rights and obligations under this LOI may not be transferred or assigned without the prior written consent the other party.

12.  <u>Successors and Assigns</u>.  This LOI shall be binding and inure to the benefit of the parties and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

13.  <u>Disputes</u>.  Any dispute arising from this LOI shall be resolved first through mediation, whereas the parties will first attempt to resolve their dispute through at least one Mediation session.  The mediatory shall be mutually agreed to between the parties.  If the dispute cannot be resolved through mediation, then the parties may pursue litigation in the courts.

14.  <u>Court litigation</u>.  If mediation fails, disputes shall be resolved in the courts of the Commonwealth of Virginia. If either party brings legal action to enforce its rights under this Agreement, the prevailing party will be entitled to recover from the other party its expenses (including reasonable attorneys' fees and costs) incurred in connection with the action and any appeal.

15.  <u>Severability</u>.  If any provision of this LOI is held to be invalid, illegal or unenforceable in whole or in part, the remaining provisions shall not be affected and shall continue to be valid, legal and enforceable as though the invalid, illegal or unenforceable part had not been included in this LOI.

16.  <u>Counterparts</u>.  This LOI may be executed in one or more counterparts, each of which shall be deemed an original and all of which together, shall constitute one and the same document.

17.  <u>Governing Law</u>.   This LOI shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Virginia, USA, which law shall prevail in the event of any conflict of the parties.  If there is a lawsuit, the parties agree to submit to the jurisdiction of the courts of Loudoun County, Virginia.

18.  <u>Expiration</u>.   This LOI shall expire if not accepted by the Company by 5:00 p.m. Eastern Time on August 4, 2023.

**BHE HOLDINGS LLC dba BLACK HAWK EQUITY ADVISORS**

3

2150 WEST 18TH STREET, SUITE 207 ~ HOUSTON, TEXAS 77008
(409) 276-7076 ~ info@blackhawkea.com

DocuSign Envelope ID: 079BE796-FE62-4256-8F49-CB40F33A6989



If the terms and conditions of this LOI are acceptable, kindly execute a copy hereof where indicated below and return it to us or before 5:00 p.m. Eastern Time on August 4, 2023. This LOI shall be non binding except as specifically set forth herein and is subject to the negotiation and execution of the Definitive Agreement and collateral documents referred to above.

Sincerely,

Brian D. Carr, Chairman

---

ACCEPTED AND AGREED to on ___31 July 2023___ by:

Dei Vitae Enterprises LLC

By: _____
Signature

~~John Woodman~~ Susan H. Burton          President
Printed Name                              Title


**BHE HOLDINGS LLC dba BLACK HAWK EQUITY ADVISORS**

2150 WEST 18TH STREET, SUITE 207 ~ HOUSTON, TEXAS 77008
(409) 276-7076 ~ info@blackhawkea.com

4

DocuSign Envelope ID: 079BE796-FE62-4256-8F49-CB40F93A6989



## EXHIBIT A

### QI PETROPHYSICS REPORT

*QI* Petrophysics

2150 West 18th Street
Suite 207
Houston, TX 77008

28 July 2024

BDC:

I have reviewed the information sent regarding the Kansas project.

From the materials presented, and my experience, we see that the proposed is a standard production project. The proposed 3 year project is well within normal industry standards, and a viable project in my opinion, as presented. After initial review, I would recommend a comprehensive due diligence review of the project as a whole. After completion of the due diligence we could make further recommendations.

Cheers!

**Dr. Matthew Carr, P.G.**
Managing Director
*AAPG Certified Geophysicist #107*
*Texas State Geophysicist #6689*

*QI* Petrophysics
*Quality & Integrity*

2150 W. 18th Street    Suite 207    Houston, TX 77008

**BHE HOLDINGS LLC dba BLACK HAWK EQUITY ADVISORS**

2150 WEST 18TH STREET, SUITE 207 ~ HOUSTON, TEXAS 77008
(409) 276-7076 ~ info@blackhawkea.com

5

# ADDENDUM TO

# LETTER OF INTENT of 7/31/2023

I.    ASSETS TO BE SOLD

    a.    Fee simple interest in real property located at 8974 North Highway KS92, McLouth, KS 66054 subject and subordinate only to the interests of Southern Star Central Gas Pipeline, Inc. reflected in the public record filings in Jefferson County, Kansas;

    b.    All working interests owned by the Debtor listed on the attached **Exhibit A**; and

    c.    Personal property of the Debtor listed on the Debtor's Amended Schedule A/B Assets – filed in the Debtor's Bankruptcy Case on April 26, 2023 [Doc No. 44] Case No. 23-30148 BK WDNC as follows:

> **Assorted tools and tool storage boxes ($500)**
> **A diverter (a large HEAVY metal part that Larry and I built together for use in killing high pressure wells and blowouts) ($8,000)**
> **Natural Gas Fan ($100)**
> **Small Jensen Pumpjack ($50)**
>
> $8,650.00

    d.    The Debtor will also facilitate the coordination of the purchase of any interest Appalachian Royalty Company ("ARC"), if any, that it may have in the related "Leases" identified in ARC's judgment filings against KLMKH.

II.    AMENDMENTS TO TERMS PROPOSED

Black Hawk and Company hereby agree that the terms of the LOI shall be amended as follows:

    a.    Paragraph 1 any agreement is subject to the review and approval shall be amended as necessary to permit the LOI and/or other information necessary for Court-approval of the sale to be disclosed to and filed with the Bankruptcy Court for the Western District of North Carolina.

    b.    Paragraph 4 <u>Confidentiality</u> shall be amended as necessary to permit the LOI and/or other information necessary for Court-approval of the sale to be disclosed to and filed with the Bankruptcy Court for the Western District of North Carolina.

    c.    Paragraph 13 <u>Disputes</u> shall be amended to permit disputes arising from the LOI to be resolved though and pursuant to the jurisdiction of the Bankruptcy Court for the Western District of North Carolina.  To the extent allowed by the Court, Black Hawk and the Company may still choose to attempt to mediate any dispute arising from the LOI and will consider and discuss this option prior to instituting litigation.  The Parties consent to the jurisdiction of the Bankruptcy Court to hear and determine any disputes and enforce the LOI.

    d.    Paragraph 17 <u>Governing Law</u> shall be amended to be governed under, and for all purposes shall be governed by and construed in accordance with the laws of the State of North Carolina and 11 U.S.C. § 101 *et seq.*.

BHE2 Holdings, LLC

By: Brian D. Carr

Its: CEO


Dei Vitae Enterprises, LLC

By: Susan H. Burton

Its: President

# EXHIBIT B



Home                          About Us                          Contact Us

**Brian D. Carr**
*CEO/President*

Mr. Brian D. Carr is a highly regarded mechanical systems expert and has been hired as a consultant engineer throughout his twenty-six-year career by government agencies such as NASA, NAVSEA, SPAWAR and HUD.  Mr. Carr has also consulted for numerous commercial companies on dozens of projects to optimize and improve process engineering.  For NASA Mr. Carr lead a design team that produced a high-speed data recording system for Space Station Alpha.  Also for NASA, Mr. Carr headed a team that designed a cryogenic oxygen storage system for future missions to the Moon and Mars. For NAVSEA and SPAWAR, Mr. Carr led a test team that conducted sea tests for towed sonar arrays in dangerous sea conditions which brought a commendation of accolade from the Pentagon.

For HUD, Mr. Carr aided the Chief Architects office in the development of a construction management process for nationwide construction loans. He has been involved in several business ventures throughout his career and is an expert in business planning and modeling, capitalization and investment strategies and cash flow and budget analysis.  Mr. Carr has raised millions of dollars for various successful ventures in the construction, banking and oil and natural gas industries.

Mr. Carr is a founding member of BHE Advisors LLC and serves as Chairman/President of the Board of Managers.

Mr. Carr holds Mechanical Engineering and System Engineering degrees from Old Dominion University in Norfolk Virginia.  Brian resides in Lovettsville, Virginia.

**Dr. Matthew Carr**
*CEO/President, QI Petrophyscis Inc.*
*CTO/Vice President, Black Hawk Energy Advisors*
*Petrophysicist*

Dr. Matthew Carr received his M.Sc. and Ph.D. with distinction in Petrophysics from the Department of Geological Sciences, University of South Carolina, USA. In addition, he obtained a B.Sc. in Geology from Old Dominion University. Following graduation from The University of South Carolina, Dr. Carr joined Amoco Production Company. During his career with Amoco, and BP, he worked almost exclusively in the seismic rock properties strategic technology applications team. In this role, he provided quantified risk analysis for exploration projects world-wide.

After leaving BP in 1999, Dr. Carr founded Osprey Petrophysics as an independent consultant. Shortly thereafter, he was presented with an opportunity to join a start-up company Rock Solid Images to build their petrophysical services group. While Chief Petrophysicist at Rock Solid Images, Dr. Carr directed their global effort of petrophysical integration with geophysical data for seismic reservoir characterization.

Dr. Carr's expertise includes the integration of Petrophysics and Seismic Rock Properties, Rock Physics, Sandstone and Carbonate Petrology and its relation to Petrophysics, Petrographic Image Analysis, Interpretation of Nuclear Magnetic Resonance Data in Natural Porous Media as well as Multivariate Statistical Analysis of Geologic Systems.

Dr. Carr has pioneered several techniques and applications for the integration of well data and seismic data. He jointly holds a patent for the use of Neural Networks on well logs and seismic data for reservoir characterization. In addition, he possesses certification as a Professional Geophysicist from the State of Texas, as well as being an AAPG certified Professional Petroleum Geophysicist. He has also taught industry courses in Rock Physics, and the application of Rock Physics for Well Log Analysis for integration with Geophysical data, as well as Practical Formation Evaluation. He is a member of the American Association of Petroleum Geologists, the Society of Professional Well Log Analysts, the Society of Exploration Geophysicists, and the Houston Geophysical Society.

From 2006 to the launch of QIP in 2010, Dr. Carr has worked as an independent consultant to the industry, providing expertise to mitigate risk in exploration and production. His clients include major international oil companies, national oil companies, mid-sized and small independent oil and gas companies. In his over 20 years in the industry, Dr. Carr has contributed to multiple large discoveries (both domestically and internationally).

In addition to major discoveries, Dr. Carr has helped many companies to quantify risky exploration targets resulting in the redirection of exploration efforts that would offer a better success rate, saving his clients hundreds of millions of unnecessary costs. Over his career, Dr. Carr has been involved in projects across the globe, spanning most hydrocarbon exploration and production basins, and has contributed to the successful quantification of rock properties to mitigate risk for his clients.

Mr. Carr, CTO, is a founding member of BHE Advisors LLC and serves on the Board of Managers.  He is also the founder and managing director of QI Petrophyscis LLC.

Dr. Matthew Carr received his M.Sc. and Ph.D. with distinction in Petrophysics from the Department of Geological Sciences, University of South Carolina, USA. In addition, he obtained a B.Sc. in Geology from Old Dominion University. Matt resides in Houston, Texas.

**Kirk A. Deutrich**
*COO / Vice President, Operations*

Mr. Kirk A. Deutrich is an experienced operational efficiency and project management specialist who has worked in a variety of commercial and industrial settings. As COO for BHEA Portfolio Zero LLC, Mr. Deutrich oversees the daily operations of the company as well as advises and implements company strategy, protocols and procedures.  Mr. Deutrich has over 22 years of cross-functional experience in business strategy, operations optimization, project management and business development.  He is astute in contract development and negotiations and also serves as legal liaison for BHE Advisors LLC and BHEA Portfolio Zero LLC.

Mr. Deutrich is an expert in operations and project management with skills in equipment and material sourcing, custom design and manufacturing coordination with OEM's, price negotiations, purchasing, domestic and international logistics (shipping/receiving), installation, testing, and delivery.  Mr. Deutrich has worked on U.S. based projects as well as internationally in Canada, Kurdistan (Northern Iraq), Japan, Mexico and Central America, on a variety of projects including industrial water treatment, the energy sector, construction and agriculture.

Mr. Deutrich, COO, is a founding member of BHE Advisors LLC, and serves on the Board of Managers.

Mr. Deutrich is graduate of the University of Texas at Austin.  Kirk, a native Texan, has residences in Haymarket, Virginia and Bellville, Texas.

**Kim Kelly**
*Strategic Advisor*

Mr. Kim Kelly is an independent competitive intelligence consultant.  Prior to this, Kim Kelly was a manager of business development for International Launch Services, a joint venture between Lockheed Martin (LM) and two Russian companies. He has worked in proposal development for over twenty years. He started in 1982 with IBM Federal Systems, which was later acquired by Lockheed Martin.  Since 1991, Mr. Kelly has been a full-time competitive intelligence professional and has provided major CI studies to proposal teams at 10 different Lockheed Martin locations. He is a member of the Society of Competitive Strategic Intelligence Professionals (SCIP) and was instrumental in Lockheed Martin's selection as one of twelve companies (and the only aerospace company) honored for their best-practice CI operations by the American Productivity and Quality Center (APQC) in 2000.

Kim Kelly is a founding member of BHE Advisors, LLC, and serves on the Board of Managers.

Mr. Kelly holds a degree in Operations Research and Industrial Engineering from Cornell University and an MBA in Finance from George Washington University.

**Josh Baker**
*Director of Business Development*

Mr. Josh Baker's primary function will be to identify new producing assets, leases and participation opportunities that are contiguous to current operations.  Josh played two seasons in the NFL for the NY Jets and Tampa Bay Buccaneers from 2011-2013. Following retirement in the NFL, Josh co-founded Players Capital Group, a Mergers and Acquisition firm comprised of former professional athletes. He also founded Soarix, a freight and auto logistics company serving Fortune 500 companies. Josh is a graduate of the University of Delaware.

© 2020 by Black Hawk.  All rights reserved.

# EXHIBIT C

| Name of Oil and gas lease | when acquired | Withdrawing W/n | Operating | Sub-Status | Tangible Property | Disposition | Comments |
|---|---|---|---|---|---|---|---|
| Utah (Moncrief Oil and gas interests) | 2000- SO/MO OWN PROPERTY - HAVE A WORKING INTEREST | Yes | No | No | All personal property located in state is not owned by the Debtor but rather Paulsen Burton | Proposed sale to Mangey | DVE farmed out these interests to Cirrus Energy until Dec. 31, 2021 when the contract required. DVE can reactivate operations up through Dec. 31, 2021 |
| Wyoming | 2000- SO/MO OWN PROPERTY - HAVE A WORKING INTEREST | No | No | No | All personal property located in Wyoming is not owned by the Debtor but rather formerly owned by Knauf(sp) | Proposed sale to Mangey | DVE's Energy operations meant we had to be reactivated due to sale of interest |
| Colorado - Pinedale Energy (assumed and assigned) | 2009 | No | No | No | No personal property at all | Proposed sale to manager | Working interest can be reactivated through State to close |
| Kansas - Bovard and T-othy/Bovard will went to 100% | 2009 | Yes | Yes | No | See schedule | Proposed sale to Mangey | Working interest was acquired in 2009 by Global. DVE acquired mineral and working interest in 2017 and then the land purchase 2020. |
| Kansas - Global (FIRST OPERATOR) | 2017 | No | No | N/A | See schedule | Lessee nearby and excluded as KSN&I leases | These are a part of leases acquired with the rights to Global Energy in 2017 |
| Kansas - all other interests | 2001-2002 | No | No | No | No personal property at all | motion and registry not encouraged and written off | No personal property at all |
| Nevada- US energy | 2012 | No | No | No | No personal property at all | Lease reverted back to Wilma-Jay and bleak estate | To so put at interest anymore |
| Oak brook Building | 2009 | N/A | Yes-reciever | Yes-reciever | No personal property at all | In receivership | Not tenants and Regina is the Lender in Michigan |

# EXHIBIT D

# AFFIDAVIT OF EQUITABLE INTEREST

STATE OF NORTH CAROLINA    )
                                                         ) SS:
COUNTY OF _Mecklenburg_      )

Susan H. Burton, of lawful age, being first duly sworn upon oath, deposes and states:

(1)    She is a member of Dei Vitae Enterprises, LLC, and is duly authorized to provide this Affidavit on behalf of Dei Vitae Enterprises, LLC.

(2)    Dei Vitae Enterprises, LLC has an equitable interest in the following described real estate located in Jefferson County, Kansas:

Real property described in Exhibit A hereto.

(3)    Said interest is subject to and by virtue of the agreement of Marigny Oil and Gas, LLC, to pay $2,200,000.00 for such property, which amount has not as yet been fully paid.

(4)    This affidavit is for the purpose of serving notice to the public of such equitable interest.

Further affiant sayeth not.

_Susan H. Burton_
SUSAN H. BURTON

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this 7th day of _March_, 2023.

_Catherine E. Padgett_
NOTARY PUBLIC

My appointment expires: _April 24, 2027_

CATHERINE E. PADGETT
NOTARY PUBLIC
Cabarrus County, NC

{T0477854}

# EXHIBIT E

### *PROPOSED* ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** ("Agreement") is made as of the _____ day of _____ 2023 (the "Effective Date"), by and among DEI VITAE ENTERPRISES, LLC (the "Seller"), and BHEA Holdings, LLC, or its assignees or successors (the "Buyer"). Buyer and Seller shall be collectively referred herein as the "Parties."

### RECITALS:

**WHEREAS**, Seller owns certain Assets as provided on Exhibit A including that certain real property located at 8974 N. Hwy KS92, McClouth, KS 66054 (the "Real Property"); and

**WHEREAS**, on February 28, 2023, Seller filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the Western District of North Carolina, Case No. 23-30148 (the "Bankruptcy");

**WHEREAS**, Buyer desires to purchase the Assets as provided herein; and

**WHEREAS**, as provided in this Agreement, Seller desires to sell substantially all of the assets used in connection with the Business, and Buyer desires to purchase said assets, all in accordance with the terms and subject to the conditions set forth herein.

**THE PARTIES HEREBY COVENANT AND AGREE THAT THIS AGREEMENT AND THE RELATED TRANSACTION DOCUMENTS ARE CONTINGENT UPON THE APPROVAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA.**

### AGREEMENT:

**NOW, THEREFORE**, in consideration of the foregoing recitals, the mutual promises, covenants and representations of the Parties, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.  **Sale of Assets.**

    1.1.  **Sale of Assets.** Seller agrees to sell, transfer, assign, convey and deliver to Buyer, and Buyer agrees to purchase from Seller, on the Closing Date (as defined in Section 6.1 below), for the consideration hereinafter provided, all of Seller's right, title and interest in and to all of the Assets (collectively referred to as the "Assets"), free and clear of any encumbrances, including, without limitation, the following:

    1.1.1.  the Seller's fee simple interest in real property located at 8974 N. Hwy KS92, McClouth, KS 66054 (the "Real Property");

    1.1.2.  the Seller's interest in a "Farm Lease" dated 6/12/2021 FSA Farm #4452, tract 4228, Jefferson County, KS;

*DRAFT – Proposed Asset Purchase Agreement*

1.1.3.   the Seller's, tools and machines, fixtures, equipment and materials located on the Real Property;

1.1.4.   all related business records of the Seller relating solely to the operation of the Business that are reasonably necessary for Buyer to continue or resume the Business; and

1.1.5.   the Seller's goodwill and going concern value (if any) related to or connected with the Business.

1.2.    **Bankruptcy Court Order.**  To evidence the transfer of the Assets as contemplated by this Agreement, Seller shall secure an Order from the Bankruptcy Court.

1.3.    **Excluded Assets.**  Except as otherwise provided herein, Seller is not selling to Buyer, and Buyer is not acquiring from Seller:

1.3.1.   any of Seller's cash or cash equivalents on hand as of the Closing Date;

1.3.2.   Seller's bank accounts; and

1.3.3.   Except as indicated above in Paragraphs 1.1.1 through 1.1.5, any and all assets that appear in the Seller's Bankruptcy Schedules filed in Case No 23-30148 including any such RoRaP tokens or that certain Illinois real property;

1.3.4.   The Seller's retained Causes of Action including but not limited to the Avoidance Actions under sections 542 through 550 of the Bankruptcy Code and causes of action against.

1.4.    **ARC Interests**.  The Seller and Buyer agree to work together to resolve all claims and/or interests asserted by Arc Energy, LLC against the Real Property.

1.5.    **Excluded Liabilities.**  Except as otherwise set forth in this Agreement, Seller shall be and remains solely liable and responsible for all debts, obligations, duties, and liabilities of the Business of all kinds that arise prior to the Closing Date including any and all debts scheduled in the Bankruptcy.

2.    **Purchase Price and Payment.**

2.1.    **Purchase Price.**  Subject to the terms and conditions of this Agreement and the approval of the Bankruptcy Court, the total purchase price for the Assets shall be $3,000,000.00 in United States currency (the "Purchase Price").

2.2.    **Allocation of Purchase Price**.  The Purchase Price, which, for purposes of this Section 2.2, shall be allocated among the Assets in the following order of priority: (i) first to intangible current Assets, based on the book value of such assets, and (ii) second to tangible Assets based on the adjusted tax basis of such tangible Assets as of the Closing Date.  The Parties agree to prepare and file all federal, state or municipal tax returns or other governmental documentation relating to said sale.

3.    **Representations and Warranties.**

*DRAFT – Proposed Asset Purchase Agreement*

3.1. **By Seller**. Pursuant to 11 U.S.C. § 101 *et seq* and subject to the approval of the United States Bankruptcy Court for the Western District of North Carolina, Seller hereby represents and warrants to Buyer and Buying Parties as of the date hereof and as of the Closing Date the following:

3.1.1. **Organization**. Seller is duly incorporated, validly existing and in good standing with the North Carolina Secretary of State in accordance with the laws of the State of North Carolina. Seller has all requisite power and authority to execute, deliver and perform this Agreement, and any other agreement or document to be executed and delivered pursuant to this Agreement, in accordance with the terms hereof and thereof.

3.1.2. **Legal Power**. Subject to the approval of the United States Bankruptcy Court for the Western District of North Carolina, Seller has full legal power and authority to carry on the Business, to own and operate its properties and assets, and to execute, deliver, and perform all of its obligations under this Agreement and the Transaction Documents (as defined in Section 6.4 below).

3.1.3. **Authorization**. Pursuant to 11 U.S.C. § 101 *et seq* and subject to the approval of the United States Bankruptcy Court for the Western District of North Carolina, the execution, delivery and performance of this Agreement, and any other Transaction Documents, has been duly authorized by Seller and no further action of Seller of any nature is required to consummate the transactions contemplated by this Agreement or the other Transaction Documents.

3.1.4. **Validity and Enforceability**. Pursuant to 11 U.S.C. § 101 *et seq* and subject to the approval of the United States Bankruptcy Court for the Western District of North Carolina, this Agreement and the Transaction Documents, constitutes the legal, valid and binding obligation of the Seller with respect to their respective obligations hereunder and thereunder, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable equitable or bankruptcy principles.

3.1.5. **Conflicts**. Pursuant to 11 U.S.C. § 101 *et seq* and subject to the approval of the United States Bankruptcy Court for the Western District of North Carolina, the execution, delivery, and performance of this Agreement by Seller and the performance of their respective obligations hereunder, do not, with notice, the passage of time, or both, require the consent of any third party or violate or conflict with, result in any breach of, or constitute a default under, (a) any indenture, mortgage, security agreement, lease, contract, or other agreement or instrument to which Seller is a party or by which the Assets are bound, (b) any federal, state or local law, statute, ordinance, rule or regulation applicable to the operation of the Business, or (c) any judgment, decree or order to which Seller is a party or by which it or any of the Assets are bound.

3.1.6. **Disclosure**. No representation or warranty by Seller or any statement or certificate furnished by Seller to Buyer pursuant to this Agreement or in connection with the transaction contemplated by this Agreement, contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained therein not misleading.

*DRAFT – Proposed Asset Purchase Agreement*

3.1.7.  **Sufficiency of Assets**.  Seller makes no representations or warranties as to the condition of the Assets, or the adequacy and suitability of the Assets for any purpose including but not limited to the implied warranty of merchantability. The Assets as of the Closing Date shall be transferred **"AS IS-WHERE IS"**.

3.2.  **By Buyer**.  Buyer hereby represents and warrants to Seller as of the date hereof and as of the Closing Date the following:

3.2.1.  **Organization**.  Buyer is duly organized, validly existing and in good standing with the Texas Secretary of State in accordance with the laws of the State of Texas. Buyer has all requisite power and authority to execute, deliver and perform this Agreement, and any other agreement or document to be executed and delivered pursuant to this Agreement.

3.2.2.  **Legal Power**.  Buyer has full legal power and authority to execute, deliver, and perform all of its obligations under this Agreement and the Transaction Documents (as defined in <u>Section 6.4</u> hereof).

3.2.3.  **Authorization**.  The execution, delivery and performance of this Agreement, and the other Transaction Documents, have been duly authorized by Buyer, and no further action of Buyer of any nature is required to consummate the transactions contemplated by this Agreement or other Transaction Documents.

3.2.4.  **Validity and Enforceability**.  This Agreement and the Transaction Documents constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable equitable or bankruptcy principles.

3.2.5.  **Solvency**.  No insolvency proceeding of any character including bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the Buyer, Buyer's parent, affiliates, subsidiaries, and/or Buyer's parent, affiliates, subsidiaries (collectively the "<u>Entities</u>"), or any of its Assets is pending or is being contemplated by it, its principal, or any entity in which Buyer has an interest or ownership in ("Buyer's Entity"), or, to the best of the Buyer's knowledge, is being threatened against the Buyer, its principal, or Buyer's Entity by any other entity or Person (as defined in herein) and nor have the Entities made any assignment for the benefit of creditors or taken any other action that would constitute the basis for the institution of such insolvency proceedings.

3.2.6.  **Claims and Legal Actions**.  No claims, legal action, arbitration, governmental investigation or other legal or administrative proceeding or any order, decree or judgment is pending or, to the Buyer's knowledge, threatened against the Buyer or Buyer's principal which could adversely affect the consummation of the transactions contemplated by this Agreement and/or the other Transaction Documents.

3.2.7.  **Disclosure**.  No representation or warranty by Buyer or any statement or certificate furnished by Buyer to Seller or Seller's Principals pursuant to this Agreement or in connection with the transaction contemplated by this Agreement, contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained therein not misleading.

*DRAFT – Proposed Asset Purchase Agreement*

4.    **Indemnification**.

4.1.    **By Buyer**.  Buyer and Buying Parties jointly and severally indemnify and hold Seller and its shareholders, managers, officers, directors, attorneys, agents, affiliates, successors and assigns as well as the Seller's Bankruptcy estate (collectively, "Seller Indemnified Parties") harmless from and after the Closing Date against and in respect of any and all Losses incurred by or claimed against any Seller Indemnified Party relating to:

(a)    the operation of the Assets on or after the Closing Date;

(b)    any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses, including reasonable legal fees and expenses, incident to any of the foregoing or incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing this indemnity in connection with the purchase of the Assets.

4.2.    **Provisions Regarding Indemnification**.  The indemnified party shall promptly notify the indemnifying party of any claim, demand, action or proceeding for which indemnification shall or may be sought under this Agreement specifying the factual basis of such claim with reasonable detail to the extent then known by the party seeking indemnification, and, if such claim, demand, action or proceeding is a third party claim, demand, action or proceeding, the indemnifying party shall have the right, at its expense, to assume the defense thereof using counsel reasonably acceptable to the indemnified party.  The indemnified party shall have the right to participate in, at its own expense, but not control, the defense of any such third party claim, demand, action or proceeding.

4.3.    **Survival**.  All representations, warranties, covenants, and obligations set forth in this Agreement, the Transaction Documents and any other certificate or document delivered pursuant to this Agreement will survive the Closing. The right to indemnification, payment of damages or other remedy based on such representations, warranties, covenants, and obligations of the Parties will not be affected by any investigation conducted with respect to, or any knowledge acquired, or capable of being acquired, at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation.

5.    **Conditions to Obligations to Close.**

5.1.    **Buyer's Conditions**.  Except to the extent any of the following conditions are expressly waived by Buyer in writing, the obligations of Buyer to consummate the transactions contemplated by this Agreement shall be conditioned upon the satisfaction of each of the following conditions:

5.1.1.    approval of this sale and the transfer contemplated herein by the Bankruptcy Court in which the Assets are sold free and clear of any and all liens, encumbrances, and security interests of any kind;

*DRAFT – Proposed Asset Purchase Agreement*

        5.1.2.    the accuracy of Seller's and Selling Parties' representations and warranties provided herein as of the Closing Date;

        5.1.3.    each of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing Date must have been duly performed and complied with in all material respects at or prior to Closing;

        5.1.4.    Seller shall have made or be prepared and able to make all the deliveries to Buyer set forth in <u>Section 6.3</u>;

        5.1.5.    Seller shall have conducted the Business in the ordinary course thereof up and until the Closing Date, and no material adverse change will have occurred in the Business or with respect to the Assets being purchased pursuant to this Agreement.

    5.2.    **Seller's Conditions**.  Except to the extent any of the following conditions are expressly waived by Seller in writing, the obligation of Seller to consummate the transactions contemplated by this Agreement shall be conditioned upon the satisfaction of each of the following conditions:

        5.2.1.    approval of this sale and the transfer contemplated herein by the Bankruptcy Court in which the Assets are sold free and clear of any and all liens, encumbrances, and security interests of any kind;

        5.2.2.    the accuracy of Buyer's and Buying Parties' representations and warranties provided herein as of the Closing Date;

        5.2.3.    each of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing must have been duly performed and complied with in all material respects prior to the Closing Date;

        5.2.4.    furnishing of the Purchase Price in good and certified funds;

        5.2.5.    no action shall be pending or threatened seeking to restrain or prohibit, or to obtain damages or other relief in connection with, this Agreement and/or the consummation of the transactions contemplated hereby;

        5.2.6.    Buyer shall have made or be prepared and able to make all the deliveries to Seller set forth in <u>Section 6.2</u>.

    5.3    **Bankruptcy Court Approval.**  For sake of clarity and out of an abundance of caution, this Agreement shall be subject to and effective only upon the execution of the Agreement by the Parties and the Bankruptcy Court's entry of the Order approving this Agreement.

6.     **Closing.**

*DRAFT – Proposed Asset Purchase Agreement*

6.1.    The closing of the transactions contemplated by this Agreement (the "Closing"), shall take place at 10:00 A.M. on or before three (3) days after entry of an Order approving this Agreement by the United States Bankruptcy Court for the Western District of North Carolina, and any applicable (such date being referred to herein as the "Closing Date").

6.2.    At Closing, Buyer shall deliver to Seller:

6.2.1.    the Purchase Price as provided in Section 2;

6.2.2.    the Bill of Sale, executed by Buyer;

6.2.3.    a certificate of Buyer, dated as of the Closing Date, certifying that (a) all representations and warranties of Buyer are true and correct as of the Closing Date, and (b) each of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing have been duly performed and complied with in all material respects as of the Closing Date;

6.2.4.    any other documents as may be required to be executed and delivered by Buyer to Seller at Closing under this Agreement.

6.3.    At Closing, Seller shall deliver to Buyer:

6.3.1.    An Order by the Bankruptcy Court approving this Agreement;

6.3.2.    a certificate of the Seller dated as of the Closing Date, certifying that (a) all representations and warranties of Seller are true and correct as of the Closing Date, and (b) each of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing have been duly performed and complied with in all material respects as of the Closing Date;

6.3.3.    any other documents as may be required to be executed and delivered by Seller to Buyer at Closing under this Agreement including any North Carolina General Warranty Deed(s).

6.4.    For purposes of this Agreement, closing certificate, and any other document delivered in connection with this Agreement or the transactions contemplated hereby are referred to herein as the "Transaction Documents."

7.    **Covenants.**

7.1.    **Efforts.**  Prior to the Closing Date, Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 5.1 to be satisfied on a timely basis and as soon hereafter as is practicable.  Prior to the Closing Date, Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 5.2 to be satisfied on a timely basis and as soon hereafter as is practicable.

7.2.    **Notice of Breaches.**  From the date of this Agreement until the Closing Date, the Parties shall promptly deliver to the other supplemental information concerning events or

*DRAFT – Proposed Asset Purchase Agreement*

circumstances occurring subsequent to the date hereof which would render any representation, warranty or statement in this Agreement or the Schedules inaccurate or incomplete in any material respect at any time after the date of this Agreement until the Closing.  No such supplemental information shall be deemed to avoid or cure any misrepresentation or breach of warranty or constitute an amendment of any representation, warranty or statement in this Agreement or the Schedule as of the Closing Date.

7.3.   **Inspection Right.**  Prior to Closing, Buyer shall have the right to inspect the Assets, and all books, accounts, records and other information pertaining to the Business during normal business hours.

7.4.   **Risk of Loss.**  Seller assumes all risk of destruction, loss, or damage due to fire or other casualty to the Assets through the conclusion of Closing Date.  In the event of a material loss to the Assets, prior to the conclusion of this Agreement on the Closing Date, Buyer shall have the right, at its election, to either (i) complete the purchase, in which event Buyer shall be entitled to all insurance proceeds collectible by reason of such loss or damage, or (ii) to the extent that comparable Assets cannot be delivered by Seller to Buyer, terminate this Agreement, which shall be in lieu of any other right or remedy whatsoever.  For purposes of this Agreement, a material loss to the Assets is hereby referred to as a demise of the Assets in their entirety in which Buyer has no reasonable future use for the Assets following said material loss.

7.5.   **Third Party Sellers.**  From and after the Closing, Seller shall terminate all relationships, if any, with third parties where such third party sells any products or services using Seller's name.

7.6.   **Cooperation with Litigation.**  The Seller shall reasonably cooperate with the Buyer in the defense or prosecution of any litigation or proceeding, order or settlement in connection therewith, involving any third party which may be instituted hereafter against or by Buyer or its affiliates relating to or arising out of the Assets or the conduct of the Business on or prior to the Closing Date.  The Buyer shall reasonably cooperate with the Seller in the defense or prosecution of any litigation or proceeding, or order or settlement in connection therewith, involving any third party which may be instituted hereafter against or by Seller or its affiliates relating to or arising out of the Assets or the conduct of the Business on or after the Closing Date.

8.   **Termination.**

8.1.   This Agreement may, by notice given prior to or at the Closing, be terminated:

8.1.1.   by Buyer if any of the conditions in Section 5.1 have not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived in writing such condition on or before the Closing Date;

8.1.2.   by Seller, if any of the conditions in Section 5.2 have not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than

*DRAFT – Proposed Asset Purchase Agreement*

through the failure of Seller to comply with its obligations under this Agreement) and Seller has not waived in writing such condition on or before the Closing Date; or

      8.1.3.   by unanimous written consent of both the Buyer and Seller; or

      8.1.4.   Should an Order not be entered approving this Agreement by the United States Bankruptcy Court for the Western District of North Carolina.

      8.2.   Each party's right of termination under this <u>Section 8</u> is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies. If this Agreement is terminated pursuant to any provision under <u>Section 8.1</u> hereof, all obligations of the Parties under this Agreement will terminate, except that the obligations of the Parties in this <u>Section 8.2</u>, and <u>Section 9</u> (Miscellaneous) will survive, <u>provided</u>, <u>however</u>, that, if this Agreement is terminated because of a breach of this Agreement by the nonterminating party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the nonterminating party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

9.    <u>**Miscellaneous.**</u>

      9.1.   <u>**Further Assurances.**</u>   After the Closing, Seller will take such actions, and execute and deliver to Buyer such further deeds, bills of sale, assignments or other transfer documents as, in the reasonable opinion of counsel for Buyer, may be necessary to evidence or complete the transfer of the Assets to Buyer pursuant to this Agreement or the transfer of the Assets to the Buyer.

      9.2.   <u>**Waiver.**</u>   Failure of the Parties to insist upon the strict performance of any covenant, terms, condition, warranty, guarantee or indemnification of this Agreement or to exercise any right or remedy accruing therefrom, shall not constitute a waiver of any unremedied breach or the performance of any such covenant, term, condition, warranty, guarantee or indemnification. A waiver shall be effective only upon a written instrument executed by the respective party. Any waiver of any breach shall not effect or alter this Agreement, but rather each and every covenant, term, condition, warranty, guarantee and indemnification shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

      9.3.   <u>**Assignability and Benefit.**</u>   This Agreement may not be assigned in whole or in part, whether voluntarily, involuntarily or by operation of law, by the Parties without the prior written consent of the other parties hereto. Any assignment in violation of this <u>Section 9.3</u> shall be null and void, and shall be deemed a material breach of this Agreement.

      9.4.   <u>**Entire Agreement; Modifications; Interpretation.**</u>   This Agreement, including all schedules and exhibits hereto, together with the Transaction Documents, contains all of the agreements and understandings between the Parties and supersedes that certain Letter of Intent, by and among Buyer, Seller, all prior correspondence and agreements among the Parties, and no

*DRAFT – Proposed Asset Purchase Agreement*

oral agreements or written correspondence shall be held to affect the provisions of this Agreement. All subsequent changes and modifications to be valid to this Agreement shall be by written instrument executed by the Parties. All subsequent changes and modifications to be valid to the Transaction Documents shall be by written instrument executed by the parties to be bound by the respective Transaction Document. In the event of a conflict between this Agreement and the Transaction Documents, the terms of this Agreement shall control.

9.5.    **Mutual Drafting.** This Agreement is the mutual product of the Parties, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of each of the Parties, and shall not be construed for or against any of the Parties.

9.6.    **Governing Law; Dispute Resolution.** This Agreement and the rights and obligations of the Parties shall be governed by and construed and enforced in accordance with the internal laws of the State of North Carolina without regard to the conflicts of laws principles thereof.

9.7.    **Attorney's Fees.** In the event of a dispute arising out of or relating to this Agreement or the transactions contemplated hereby, the prevailing party, as determined by a final judgment or order issued by a court of competent jurisdiction shall be entitled to recover its reasonable attorney's fees, expenses and costs from the non-prevailing party.

9.8.    **Expenses.** Buyer shall, except as otherwise specifically provided herein, bear Buyer's expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement, including all fees and expenses of agents, representatives, consultants, counsel and accountants. Seller shall, except as otherwise specifically provided herein, bear Seller's expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement, including all fees and expenses of agents, representatives, consultants, counsel and accountants.

9.9.    **Specific Performance.** It is understood and agreed that money damages may not be a sufficient remedy for any breach of this Agreement and that the Parties shall be entitled to equitable relief without necessity of posting a bond or other security arrangement to the extent fully permitted by North Carolina law, including injunction and specific performance, as a remedy for any such breach. Such remedies shall not be deemed to be the exclusive remedies for a breach by any party but shall be in addition to all other remedies available to the Parties at law or equity.

9.10.    **Remedies Cumulative.** All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise or beginning of the exercise of any thereof by any party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such party.

9.11.    **Sales Tax.** In the event all or any portion of the transactions contemplated by this Agreement are subject to sales and use tax imposed by the State of North Carolina, Seller hereby agrees to pay any such tax to the applicable taxing authority when due.

*DRAFT – Proposed Asset Purchase Agreement*

9.12.    **Rights of Third Parties.**    Except as set forth in <u>Section 4</u> above, nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the Parties, any right or remedies under or by reason of this Agreement.

9.13.    **Counterparts.**    This Agreement may be executed simultaneously or in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document.  The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.  Original signatures transmitted by facsimile or in ".PDF" format shall be effective to create such counterparts.

9.14.    **Binding Effect.** This Agreement shall not become binding and effective for the Parties unless and until the closing of this Agreement which is to occur on or about the Closing Date.  Notwithstanding the aforementioned, the Parties may execute this Agreement prior to the Closing Date, and its respective attorneys may hold the signature pages in escrow until the Closing Date.

9.15.    **Severability.**  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Applicable Law governing this Agreement and not capable of being modified, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Applicable Law and, to the extent necessary, shall amend or otherwise modify this Agreement, without the payment of additional consideration, to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving maximum effect as permitted by Applicable Law to the intent of the Parties.

9.16.    **No Waiver of Right to Enforce Terms of Agreement.**    By signing this Agreement, the Parties do not waive any right or claim to enforce the terms of this Agreement, but rather the Parties specifically reserve their rights to bring an action in a court of competent jurisdiction to enforce the terms of this Agreement.

9.17    **Authority.**  The Parties represent and warrant that he/she/it is fully authorized to execute this Agreement on behalf of the respective party.

*[SIGNATURE PAGE FOLLOWS]*

*DRAFT – Proposed Asset Purchase Agreement*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be signed and sealed as of the date first above written.

<u>**SELLER**</u>:

**DEI VITAE ENTERPRISES, LLC**

By: _____ (SEAL)
Name: _____
Title: _____

<u>**BUYER**</u>:

**BHEA HOLDINGS, LLC**

By: _____ (SEAL)
Name: _____
Title: _____